## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RUSSELL PUZAUSKY<br><br>                                    Plaintiff<br><br>Vs.<br><br>NORFOLK SOUTHERN CORPORATION<br><br>                                  Defendant | CIVIL ACTION<br><br>NO.: 2:21-cv-606<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1. The plaintiff, Russell Puzausky, brings this action against the defendant, Norfolk Southern Corporation (NS) for violations of the *Federal Rail Safety Act*, 49 U.S.C. §20109.

## JURISDICTION

2. This court has subject matter jurisdiction in this case pursuant to the *Federal Railroad Safety Act*, 49 U.S.C. §20109(d) (3)(FRSA).

## PARTIES

3. The plaintiff, Russell Puzausky, is a citizen and resident of the Commonwealth of Pennsylvania, residing therein at 106 Shaker Heights Drive, Aliquippa, PA 15001.

4. The defendant, Norfolk Southern Corporation, is a corporation duly organized and existing under and by virtue of the laws of the State of Virginia, and does business in the Western District of Pennsylvania with an office located in or near Conway, Pennsylvania.

5. At all times material hereto, the defendant operated trains in, had employees working in, and did business in the Western District of Pennsylvania.

## FACTS

6.   During all times mentioned herein, the defendant railroad carrier engaged in interstate commerce by providing railroad transportation between several of the states of the United States, including but not limited to, the Commonwealth of Pennsylvania, the State of New Jersey, and other states.

7.   At the time of the defendant's FRSA violations, the plaintiff was employed by the defendant railroad as a locomotive engineer, and qualified as an employee within the meaning of 49 U.S.C. §20109.

## COUNT I : FRSA CAUSE OF ACTION

8.   Plaintiff has been employed by Norfolk Southern since 1999.

9.   At all times material hereto, Plaintiff was a qualified locomotive engineer who primarily worked at Norfolk Southern's Conway Yard in or near Pittsburgh, Pennsylvania.

10.   During December 2019 through March 2020, Plaintiff frequently reported to NS supervisors Keller and Michaels about locomotives that failed to meet NS and federal regulations and that were unsafe to move. These safety violations were especially significant because the train would often carry hazardous materials.

11.   Plaintiff made a total of approximately 40 reports of rules violations concerning locomotive and other problems rendering them unsafe.

12.   In several of these situations, the locomotives were taken out of service or time in service was delayed while mandated inspections, repairs, or other actions were taken.

13.   Trainmaster/Senior Rail Operations Manager James Keller frequently voiced his displeasure with Plaintiff making complaints about non-compliant locomotives because the complaints resulted in train delays.

14. Mr. Keller often complained that the "management team," specifying NS Road Manager Michaels and himself, could no longer tolerate the delays caused by Plaintiff's reporting non-compliant locomotives.

15. After these warnings, Mr. Keller would often scrutinize Plaintiff and his crews more carefully than other crews appearing to look for violations and continuously impressing upon the Plaintiff the need to get his work done more quickly, even if some issues had to be overlooked.

16. During the latter part of February and early March 2020, Mr. Keller continued to harass Plaintiff about causing or risking departure delays by reporting problems.

17. Keller continued to refer to the "management team," specifying Mr. Michaels and himself, as no longer able to tolerate the delays caused by Plaintiff's reporting non-compliant locomotives.

18. Keller consistently informed Plaintiff that his reporting about non-compliant locomotives was causing Keller and Michaels to "get their asses chewed out" by their superiors.

19. On January 18, 2020, Plaintiff's supervisor, Trainmaster James Keller, drove Plaintiff and his conductor from the Conway Yard main building to track 110 where the train to which he was assigned was located.

20. The road conditions were hazardous. The roads were very slippery because of sleet and freezing rain.

21. The speed limit for the subject road was also 15 mph.

22. In spite of the speed limit, Mr. Keller was operating his vehicle dangerously and at a speed of 40 mph.

23. Mr. Keller risked Plaintiff and his conductor's safety so that their train would depart on time.

3

24. On January 19, 2020, Plaintiff sent an email to Mr. Steve Myrick, NS's Conway Yard Superintendent.

25. Plaintiff reported Mr. Keller's hazardous driving and the fear Plaintiff, and his conductor, experienced for their own safety.

26. Plaintiff specifically told Mr. Keller that he was going to report the hazardous driving to Mr. Myrick.

27. NS has documents called "Job Aids." A Job Aid is essentially a timetable that a train crew is to follow from the time reporting to work until they were finished at the end of the workday. The "Job Aid" identifies "triggers" and "escalators." Triggers are events that will cause the crew to be late and miss one or more of the specified time deadlines. When a "trigger" occurs, the conductor must escalate the event which means the *conductor* must notify supervision of the potential departure delay.

28. Significantly, while plaintiff was an engineer, the Job Aide is a document *addressed to conductors and it is the conductor's responsibility* for compliance with it and notification of supervisors under the trigger and escalation rules.

29. The "Job Aid" document imposes *no* obligations on engineers.

30. In early March 2020, neither the Plaintiff nor other employees working at the Conway Yard had been given Job Aids nor had they known that such documents existed. Similarly, the Job Aids were never posted in the Daily Operation Bulletins or otherwise displayed or circulated.

31. Prior to March 5, 2020, Plaintiff had never seen a "Job Aid" and the concept of a Job Aid, how to read it, etc. was never explained to him.

4

32. On March 5, 2020, NS Road Manager R.J. Michaels handed Plaintiff a document he did not recognize, and that Plaintiff only later learned was a Job Aid and then Mr. Michaels left. Adding to Plaintiff's confusion, the Job Aid handed to the Plaintiff on March 5, 2020 did not concern the job he was working that day but the job he would be working on the next day.

33. Mr. Michaels did not converse with Plaintiff about the document, did not explain the document, did not instruct plaintiff that he had any obligations under it, nor did he allow the Plaintiff to read the document and then ask questions about it. Mr. Michaels simply handed it to the Plaintiff and walked away.

34. Plaintiff would subsequently learn that the Job Aid specified the time allotted for the engineer to board the locomotives and couple the rail equipment into a train in the yard.

35. However, Plaintiff would subsequently learn that the allocated time was insufficient to perform a thorough inspection of the equipment.

36. Plaintiff had consistently complained to railroad supervisors that they were not providing sufficient time to properly inspect the locomotive and to make certain that they complied with both NS and federal regulations.

37. Plaintiff had previously been told that on-time departures was more important than adequate pre-departure inspection and the Job Aid confirmed that NS had chosen productivity over safety. This was especially distressing to the Plaintiff as most of his trains carried hazardous materials.

38. On March 3, 2020, even though the Job Aid on its face only applies to conductors, the Plaintiff, an engineer, and his conductor were taken out of service for allegedly disobeying the Job Aid and delaying the departure of his train.

39. The alleged violation was that on March 6, 2020, Plaintiff's crew departed the terminal too late delaying the movement of equipment.

40. Earlier that day, Mr. Keller told Plaintiff and his crew that his train was to be the first to depart at 10:00 AM. However, Mr. Keller drove the crew of another train to their equipment before driving Plaintiff and his crew to their equipment.

41. As a result of Mr. Keller's action, the other train blocked in Plaintiff's train and prevented Plaintiff's train from departing until the other train departed. This resulted in Plaintiff's train departing late.

42. Thus, the alleged violation was caused by Mr. Keller's deliberate actions in transporting the other crew first and permitting that other crew to position its train in such a way as to delay the departure of Plaintiff's train. Said actions by Mr. Keller were deliberate efforts by the management team to "set up" Plaintiff for discipline in retaliation for his refusing to stop reporting non-compliant equipment and trains that would carry hazardous materials through densely populated areas.

43. The charging officer was Mr. R. J. Michaels, a colleague of Mr. Keller's, and member of the "management team" which was angry at Plaintiff for reporting non-compliant locomotives. Their offices are at the same location and they frequently collaborate on the railroad operations.

44. On April 18, 2020, NS held a Disciplinary Hearing on the charges of alleging (1) intentional delay of assignment resulting in unearned overtime and (2) failure to comply with timelines, triggers, and escalations in assigned job aids.

45. These charges were a subterfuge to retaliate against Plaintiff filing a complaint about Mr. Keller's unsafe driving approximately six weeks earlier and for Plaintiff's refusal to

comply with Mr. Keller's and Mr. Michael's continual orders to stop reporting safety issues and rules violations with locomotives that could delay train departures.

46. In fact, NS Division Superintendent Neil Palmer told Mr. Bitner, a union official, that the hearing was merely a "formality," and that Plaintiff would be terminated.

47. The disciplinary hearing was so outrageously prejudicial to the Plaintiff that it presents prima facie evidence that it was intended as retaliation against Plaintiff.

48. NS conducted the hearing in such a manner that critical evidence was not permitted, and thus, the hearing record was intentionally skewed to support the termination of Plaintiff rather than to present the facts fairly and impartially.

49. The hearing was prejudicially overseen by Terminal Superintendent Diffinderfer

50. Significantly, Mr. Diffinderfer severely prejudiced the hearing against Plaintiff by:

   a. Refusing to allow into evidence the statements provided by several other NS employees that they too were unaware of Job Aids and that they too had never received a Job Aid before Plaintiff's alleged incident.

   b. Refusing to allow witnesses to testify that they too were unaware of Job Aids and had never received a Job Aid before Plaintiff's alleged incident.

   c. Refusing to produce, as required by the Collective Bargaining Agreement, witnesses requested by Plaintiff and his Union.

51. The most important witnesses in favor of NS's position were Mr. Keller and Mr. Michaels. Mr. Keller was the supervisor whom the Plaintiff reported as driving unsafely in January 2020. Both Keller and Michaels were members of the "management team" who continuously harassed Plaintiff about reporting problems with non-compliant locomotives.

52. The testimony was inaccurate and untruthful in several important respects:

   a. Although Mr. Keller testified that no one informed him of Plaintiff and his crew's inability to meet the timetable, the conductor had in fact reported to Mr. Keller some of the delays they had encountered. In other words,

7

        contrary to Mr. Keller's testimony, Plaintiff's conductor did properly meet designated triggers and escalate the issues to his supervisor.

    b.     Although there was testimony that the crews at the Conway Yard previously had copies of the Job Aids before the Plaintiff was handed the Job Aid on March 5, 2020, in fact, Plaintiff and most Conway personnel did not receive any Job Aids until after Plaintiff was taken out of service.

    c.     There was testimony that Plaintiff previously had been provided with a Job Aide even though he was given an additional one on the day before he was taken out of service, but in fact the Plaintiff had never been given any Job Aid before March 5, 2020.

    d.     There was testimony there had been a conversation with Plaintiff about the Job Aid when it was given to him the day before taking Plaintiff out of service, but no such conversation ever occurred. In fact, the Job Aid was handed to Plaintiff without any explanation or opportunity to discuss it.

53.     Mr. Michaels removed Plaintiff from service and initiated the charges which were filed against Plaintiff by Mr. Michaels, for violating the NS Job Aid. However, as discussed previously, on its face the Job Aid, as well as the triggers and escalations, are directed to conductors; not engineers like the Plaintiff.

54.     In retaliation against the Plaintiff for reporting problems with locomotives that did or could cause a train to be delayed, and for reporting Mr. Keller's hazardous driving on January 18, 2020, Plaintiff was terminated. The termination was dated April 30, 2020.

55.     The evidence reveals that the alleged violation of the Job Aid was not the actual reason for Plaintiff's termination, but was merely a subterfuge to punish Plaintiff for performing proper locomotive inspections and reporting problems when found them because doing so resulted in the late departure of train and reflected poorly on management's productivity, and further because Plaintiff reported Mr. Keller's unsafe driving.

56. The Federal Rail Safety Act, 49 U.S.C. § 20109, prohibits retaliatory actions against an employee who reports unsafe conditions to a supervisor or who refuses to engage in improper actions. In particular,

   a. Section 20109(b)(1) provides that a railroad "shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for— (A) reporting, in good faith, a hazardous safety or security condition."

   b. Section 20109(a)(2) provides that a railroad "shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee [who refuses] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security."

57. Plaintiff's reporting Mr. Keller's hazardous driving was protected under 49 U.S.C. § 20109(b)(1) and his discharge for reporting this hazardous safety condition constitutes a violation of the FRSA.

58. Plaintiff's reporting of unsafe locomotive conditions, and refusal to operate a locomotive that had not been inspected as required by federal law and regulations or had some defect or other problem that rendered it unusable by federal law and regulations was protected by 49 U.S.C. §§ 20109(a)(2) and (b)(1), and his discharge for reporting non-compliant locomotives and refusing to operate non-compliant equipment constitutes a violation of the FRSA.

59. As a result of the harassment, intimidation, and wrongful termination by NS through its supervisory employees, Plaintiff has suffered severe emotional and psychological injuries and/or aggravation of pre-existing emotional and psychological injuries.

60. On September 3, 2020, the plaintiff filed a FRSA complaint with the Secretary of Labor's Region II OSHA Whistleblower Office. This was filed within 180 days from the date the plaintiff became aware of the defendant railroad's intent to take adverse or unfavorable personnel action against him.

61.     The Region II OSHA Whistleblower Office commenced its investigation, and the plaintiff fully cooperated with OSHA's investigation. However, OSHA did not issue a final decision within 210 days after the filing of the FRSA complaint. The delay was not due to any bad faith on the part of the plaintiff.

62.     Plaintiff has exhausted all administrative remedies as required by statute and/or common law.

63.     Pursuant to 49 U.S.C. §20109(d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in the United States District Court for a jury trial regarding the railroad's violation of the FRSA.

64.     Pursuant to the FRSA, 49 U.S.C. §20109(d)(3), the plaintiff is now bringing this original action in law and equity for de novo review by the United States District Court for the Western District of Pennsylvania, which court has jurisdiction over this FRSA action without regard to the amount in controversy.

**WHEREFORE,** in order to encourage employees to freely report all injuries without fear of any retaliation, and further to encourage all employees to freely report unsafe conditions and violations of federal statutes and regulations, thereby ensuring the Federal Railroad Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area in our nation's railroad operations, the plaintiff demands a judgment upon each Count under the FRSA for all relief necessary to make him whole, including but not limited to:

  a.    Reinstatement with all back pay, benefit, and other economic losses caused by plaintiff's termination;

  b.    expungement of all references to the disciplinary actions set forth above;

  c.    compensatory damages for mental anguish and emotional distress due to the

        defendant's conduct;

d.    compensatory damages for economic losses due to the defendants' conduct;

e.    the statutory maximum of punitive damages;

f.    special damages for all litigation costs including expert witness' fees and attorneys' fee.

                **COFFEY KAYE MYERS & OLLEY**

        **BY:** _____

                **LAWRENCE A. KATZ, ESQUIRE**
                Attorney I.D. No. 30621
                Suite 718, Two Bala Plaza
                Bala Cynwyd, PA  19004
                (610) 668-9800
                (610) 667-3352 (Fax)
                **Attorney for plaintiff**